Filed 3/23/21  P. v. Mitchell CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TORY BRIAN MITCHELL,<br><br>    Defendant and Appellant. | G058856<br><br>(Super. Ct. No. 19CF2693)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed as modified.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine Gutierrez and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

A jury convicted appellant Tory Brian Mitchell of assault with a deadly weapon — a bicycle chain with an attached metal carabiner. (Pen. Code, § 245, subd. (a)(1).)[1] The trial court separately found true prior conviction allegations of two serious felonies, two strikes, and three prison commitments. (§§ 667, subds. (a)(1), (d) & (e)(2)(A), 1170.12, subds. (b) & (c)(2)(a), and 667.5, subd. (b).) It sentenced Mitchell to an 11-year term, comprising a doubled two-strike midterm of six years for the assault, plus an additional five years for one serious felony prior. One strike, one serious felony prior, and all three prison priors were stricken.

Mitchell raises four claims on appeal: (1) The trial court prejudicially erred by allowing the prosecution to introduce hearsay evidence of witnesses who identified Mitchell as the assailant and initial aggressor; (2) insufficient evidence showed the chain Mitchell used was a deadly weapon or one likely to cause great bodily injury; (3) the prosecutor committed misconduct during her closing arguments; and (4) several postconviction costs and fee assessments must be stricken because the court failed to orally impose them at the time of judgment.

We reject the first three contentions, but partially agree with the fourth. Mitchell affirmatively waived any impropriety in the two mandatory fee assessments he now questions on appeal. Mitchell, however, did not waive his objection to a nonmandatory booking fee and it must be stricken. Further, the abstract of judgment must be corrected to reflect the actual restitution and parole revocation fines the court orally imposed. The judgment is therefore affirmed as modified.

I

FACTUAL BACKGROUND

One September afternoon, F. Ortiz was standing near her mother's Santa Ana house, talking on her cell phone. Across the street Ortiz saw a group of homeless

---

[1] All further undesignated statutory references are to the Penal Code.

people sitting together. Among them were two men Ortiz identified in a photograph shown to her at trial. One was a shirtless man, Mitchell, and the second was an "older man," Brian B.

Ortiz heard Mitchell scream at the older man, telling him he had to buy Mitchell a beer because the older man had spilled Mitchell's beer. She said, "He was saying, 'Bitch, buy me my beer. After you spilled my beer, you didn't want to buy one – you don't want to buy a beer for me.'"

Ortiz watched as Mitchell then took a bicycle chain out of his backpack and repeatedly beat the older man with it 6 to 10 times. The older man tried to shield himself, first with his hands and then with a bicycle. He tried to walk away, but fell with the bicycle on top of him. While he was down, Mitchell "started kicking him." Someone helped the older man get up, but Mitchell pushed him back down. Police arrived in about 10 minutes. Ortiz testified she spoke to several police officers that day, and told them what she observed.

At about the same time, M. Sanchez was driving by when she saw one man being struck with a chain, and the man being hit pick up a bicycle to shield himself. She pulled over and called 911. Sanchez testified that when police arrived, she "point[ed] out who was involved . . . [;] the shirtless man as the man with the chain and . . . the other man as the man being hit."

Along with other officers, Santa Ana police officers James Babinski and Mike Nolan responded. Babinski found a bicycle chain in the shrubbery near where Mitchell had been instructed to sit on the curb.

Paramedics treated Brian B. for minor injuries. There was redness and irritation to his back and head, some "surface" blood, and an abrasion to his knee. The redness on his back showed clear impressions of a bicycle chain. Brian B. declined an offer to take him to the hospital. Mitchell had no visible injuries.

3

II

DISCUSSION

A. *Hearsay*

Mitchell first contends the trial court erred "in admitting hearsay testimony by Officer Nolan that witnesses at the scene told him [Mitchell] was the perpetrator, and that [Brian B.'s] statement was consistent with the 911 call." The first claim is forfeited for a failure to object, but even on the merits, any purported evidentiary error was harmless. As for the second claim, no error occurred because the court sustained defense counsel's objections to the prosecutor's multiple unsuccessful attempts to elicit evidence of Brian B.'s statements to police.

1. *Additional Background*

Brian B. did not testify. At trial, Ortiz described the initial assailant as a tall man, with "light skin," and wearing pants but no shirt. Sanchez also testified the man with the chain was shirtless. There was no evidence of any other shirtless men at the scene except Mitchell.

The prosecutor showed Ortiz a photograph of two men, and she testified it depicted the two men involved in the incident.[2] She said Mitchell in the photograph was the "man who took the chain out," and the older man in the photo was the one "that shirtless guy was yelling at."

Sanchez was shown the same photograph at trial, and she also identified the two people depicted in the photograph as the same two men involved in the incident. She testified Mitchell in the photo was the man wielding the chain, and "the person that was being hit is the man with a shirt on." Sanchez added that when police arrived, she "verbally" "point[ed] out who was involved[;] . . . the shirtless man [was] the man with

---

2      The photograph, admitted as People's Exhibit 2, is a "[c]olor photograph depicting two males; one male without a shirt and the other male wearing a blue shirt sitting on a cement ledge. . . ."

4

the chain and . . . the other man [was] the man being hit." Neither Ortiz or Sanchez was asked to identify Mitchell in court as the shirtless man.

Babinski testified he was called to the scene of an assault and on arrival contacted Mitchell, among others. At trial, he testified he took the photograph shown to Ortiz and Sanchez, explaining it was a still photo taken from his body camera video. He also pointed out Mitchell in court as the shirtless man depicted in the photo. No objection was lodged to this identification.

Babinski explained he spoke to several witnesses at the scene and, in doing so, he was "pointed to an alleged victim and an alleged aggressor," both of whom he said were depicted in the body camera photo. Again, Mitchell lodged no objection.

Nolan testified he also was called to the scene. When shown the photo exhibit shown to the other witnesses, he too identified Mitchell in court as the shirtless man depicted in the photo.

The prosecutor then asked Nolan a question calling for a "yes" or "no" answer: "Did you learn while you were there that someone had been a potential aggressor in a fight?" Defense counsel objected on foundational and hearsay grounds. The court asked the prosecutor, "What's it offered for?" and the prosecutor responded, "To explain his next steps, you honor." The court overruled the objection, stating *"It's not offered for the truth that this person he talked to was actually the aggressor."* (Italics added.)

The prosecutor reframed the question and asked: "And so someone was pointed out then as a potential aggressor . . . correct?" Nolan replied, "That's correct." No objection was made to this question and answer.

The prosecutor then inquired as to *who* had been pointed out as the potential aggressor: "Did you contact that [potential aggressor]?" Nolan replied he did. The prosecutor asked Nolan whether he saw that person in court, and he identified Mitchell. Again, defense counsel did not object to these questions and answers.

5

Thus, Nolan testified the person he talked to, Mitchell, was the aggressor solely based on who was "pointed out" to him while he was "talking to witnesses on the scene." And despite the court's earlier ruling on the simple question as to *what* Nolan did next, the prosecutor had gone much further, eliciting evidence that Mitchell was the person "pointed out" as the assailant. In other words, she elicited this testimony for its truth. Although Nolan's basis for testifying Mitchell was identified at the scene as the aggressor was hearsay, defense counsel did not object to this line of questioning or to Nolan's responses.

The prosecutor then asked Nolan whether the second person depicted in the photograph, Brian B., "was described to you as the potential or alleged victim in the case." Nolan did not answer because the trial court sustained a hearsay objection.

The prosecutor rephrased her question, "Did you talk to the second person depicted in [the photo]?" and Nolan replied he did. The prosecutor asked, "And in talking to that [second person], was that consistent with what you were told that person's role was on scene?" Defense counsel's hearsay objection was overruled because it called for a yes or no answer, not for what was said. When the prosecutor repeated the question, the court sustained defense counsel's relevance and vagueness objections.

The prosecutor tried again, but ended up with the same results: Nolan talked to the second person, who told Nolan what happened. But when asked whether this person's statement to Nolan was "consistent with what the other officers had told [Nolan] had occurred . . . when [Nolan] arrived on the scene," and whether it was "consistent with the call for service," the trial court sustained hearsay objections.

The prosecutor sought to use other photo exhibits, which depicted Brian B.'s injuries, to slip in the fact Brian B. was "identified in this investigation" as "the

6

victim," but defense counsel's objection was again sustained.[3]  The prosecutor finally gave up and moved on.

2. *The Nonhearsay Ruling*

We review a trial court's ruling overruling a hearsay objection for an abuse of discretion.  (*People v. Fields* (1998) 61 Cal.App.4th 1063, 1067.)  The prosecutor asked Nolan a simple yes or no question: "Did you learn while you were there that someone had been a potential aggressor in a fight?"  This called for a nonhearsay response because it did not ask Nolan to state *what* he had learned, *how* he learned it, or *who* that "someone" was.

Evidence Code section 1200, subdivision (a), defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  The question to which defense counsel made her hearsay objection did not solicit "evidence of a statement" from an out of court declarant, let alone a statement offered for its truth.  The trial court properly overruled the objection, stating "It's not offered for the truth that this person that he talked to was actually the aggressor."  The only responsive answer Nolan could give to the prosecutor's question would have been "Yes."  Such an answer in this case involved neither an out of court declarant nor a statement admitted for its truth.  The court therefore did not abuse its discretion.

Simply put, defense counsel's objection was premature; it was the next set of questions and answers that solicited and obtained hearsay-based responses.  But Mitchell did not object to these questions.

---

[3]     Later in Nolan's testimony, the prosecutor tried to return to the subject and asked him, "[B]ased on your investigation, did you make a determination as to who the aggressor was in this case?"  Defense counsel objected on foundational and hearsay grounds, and the objection was sustained.  Similarly, the trial court also sustained a hearsay objection when the prosecutor tried to get Nolan to say *why* he arrested Mitchell, and Nolan responded it was because Mitchell was the "dominant aggressor," "*based on the information that was presented*."  (Italics added.)

7

### 3. *Forfeiture*

"'"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.]"  This rule applies equally to any claim on appeal that the evidence was erroneously admitted, other than the stated ground for the objection at trial.'" (*People v. Landry* (2016) 2 Cal.5th 52, 86; accord, Evid. Code, § 353.)  The rule "applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198; see *Peretz v. United States* (1991) 501 U.S. 923, 936-937.)  Accordingly, Mitchell forfeited his newly minted hearsay claims regarding what Nolan testified to after the trial court's initial nonhearsay ruling.

Mitchell seeks to avoid forfeiture by arguing any "[f]urther objections would have been futile, because the objection had already been overruled."  The record belies this claim because the trial court sustained every subsequent well-taken hearsay objection.  The only overruled hearsay objection in this part of Nolan's testimony involved the question, "Did you learn while you were there that someone had been a potential aggressor in a fight?"  As noted, this question did not call for a hearsay answer, and it was relevant for the nonhearsay purpose of showing how the investigation progressed.  Our review of the record, and how the court ruled on proper objections, leaves no doubt the court would have sustained objections to the prosecutor's hearsay-based follow-up questions posed to Nolan had they been made.  Mitchell's futility argument is itself futile.  His belated hearsay objections to the subsequent questions and answers is not properly before us because he did not object below.  The claim is therefore forfeited.

### 4. *Any Assumed Error Was Harmless*

Forfeiture notwithstanding, even if we assume the trial court erred in admitting Nolan's testimony regarding who was pointed out to him as the "potential aggressor,"[4] any purported error was harmless.

Mitchell argues the purported error was prejudicial because "[t]here was no properly admitted in[-]court identification of [Mitchell] as the perpetrator in this case." Not so. There were four witnesses who provided in-court testimony circumstantially identifying Mitchell as the shirtless man who was the initial aggressor and assailant — Ortiz, Sanchez, Babinski, and Nolan. Tying these four witnesses together was the key piece of evidence: the photo depicting the shirtless Mitchell and Brian B. taken at the scene soon after the assault.

Both Ortiz and Sanchez testified about what they saw before police arrived, both identified the shirtless man in the photograph as being the assailant, and both were cross-examined extensively. Babinski authenticated the photo as a still taken from his body camera footage on the day of the incident. Both he and Nolan positively identified Mitchell in-court as the shirtless man depicted in the photo, and Brian B. as the victim of the assault. Both officers also were cross-examined extensively.

Mitchell minimizes these interconnected pieces of evidence, stating "this was *only* circumstantial evidence which fell short of proof beyond a reasonable doubt." (Italics added.) This not only misstates the evidentiary equivalence of direct and circumstantial evidence, but it ignores the strength of the circumstantial evidence in this case. (See CALCRIM No. 223.)

---

[4] The record does not reflect why the prosecutor did not ask Ortiz or Sanchez if they saw the shirtless man in court. But even if they could not identify Mitchell at trial, sufficient foundation was laid to admit their on-scene identifications under the prior identification exception to the hearsay rule. (See Evid. Code, § 1238; *People v. Garceau* (1993) 6 Cal.4th 140, 201, disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

In comparison, the hearsay evidence Nolan testified to regarding why he spoke to Mitchell at the scene — because Mitchell was identified by witnesses as being the "potential aggressor" — was of marginal evidentiary value; both Ortiz and Sanchez had testified they told police who the "aggressor" was in the incident. Nolan's statement was superfluous in light of the other, much stronger, testimonial evidence and the unifying photograph. It is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836.) Any purported error in the admission of Nolan's statement was therefore harmless.

Mitchell raises a corollary constitutional claim, and argues admission through Nolan of the "potential aggressor" hearsay evidence violated his Sixth Amendment right to confrontation. Because Mitchell did not object, on any ground let alone a constitutional ground, the constitutional claim is likewise forfeited. (*In re Seaton, supra,* 34 Cal.4th at p. 198.)

It is also meritless. Although Mitchell does not specify who he was not able to confront, it is reasonable to infer the information Nolan received as to the "potential aggressor" came from Ortiz and Sanchez. Such hearsay would not have run afoul of the Sixth Amendment, however, because both were available at trial, testified, and were subject to cross-examination. "[W]hen the [hearsay] declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9.) As for the trial court's original nonhearsay ruling on whether Nolan "learned" who the potential aggressor was, "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Ibid.*) There was no Sixth Amendment violation.

10

### 5. *Brian B.'s Statements*

Finally, Mitchell misreads the record concerning Brian B.'s statements to the officers. The prosecutor failed to introduce these hearsay statements because all her attempts to do so were thwarted by properly sustained hearsay objections.[5] Simply put, what Brian B. told the officers, and whether it was consistent with other information, was never admitted into evidence. There was no evidentiary error, statutory or constitutional, in this respect, and Mitchell's claim is without merit.

## B. *The Bike Chain as a Weapon Likely to Produce Great Bodily Injury*

Mitchell next contends we must reverse his conviction because "a bike chain is not an inherently dangerous weapon," and there was insufficient evidence Mitchell "used sufficient force with the bike chain making it likely to inflict great bodily injury."

### 1. *Additional Background*

Mitchell was charged with "willfully and unlawfully commit[ting] an assault upon the person of Brian B. with a deadly weapon and instrument, namely a chain with metal carabiner." (Capitalization omitted.) The trial court instructed the jury it could not convict Mitchell unless it found beyond a reasonable doubt Mitchell willfully did an act with a deadly weapon, not in self-defense, that by its nature would directly and probably result in the application of force, and Mitchell had the present ability to apply force with a deadly weapon. Actual injury was not required, "[b]ut if someone was injured, you may consider that fact." A deadly weapon "is any object, instrument, or weapon that is inherently deadly *or* one that is used in such a way that it is *capable* of causing and *likely* to cause death or great bodily injury," which was defined as "significant or substantial physical injury . . . greater than minor or moderate harm." (CALCRIM No. 875, italics added.)

---

[5] Further reinforcing our previous conclusion it would not have been futile if Mitchell had lodged hearsay objections earlier in the trial.

In addition, the court gave a defense-requested pinpoint instruction: "Great bodily injury . . . means significant or substantial injury. Because the [offense refers to] the capability of inflicting significant injury, neither physical contact nor actual injury is required to support a conviction. [¶] However, if injuries do result, the nature of such injuries and their location are relevant facts for consideration in determining whether an object was used in a manner capable of producing and likely to produce great bodily injury."

2. *Standard of Review*

Our inquiry is limited to whether substantial evidence supports the jury's finding that Mitchell used the bicycle chain as a deadly weapon. (*In re B.M.* (2018) 6 Cal.5th 528, 533; see *In re Raymundo M.* (2020) 52 Cal.App.5th 78, 87 ["Whether a perpetrator . . . uses an object in a manner that renders it a deadly weapon [is a] question[] for the trier of fact, the resolution of which we review for substantial evidence"].)

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence . [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support'" the

12

jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Simply put, Mitchell "bears an enormous burden" to prevail on his sufficiency of the evidence claim. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

### 3. *Legal Background*

The parties agree the bicycle chain in this case was not an inherently deadly weapon. Rather, the prosecution's theory was that Mitchell used the chain in a manner capable of and likely to produce great bodily injury.

A """"deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury."'" [Citation.] . . . 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.'" (*In re B.M., supra,* 6 Cal.5th at pp. 532-533.)

"Although it is inappropriate to consider how the object *could* have been used as opposed to how it was actually used, it is appropriate in the deadly weapon inquiry to consider what harm could have *resulted* from the way the object was actually used. Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. . . . [A] mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." *(In re B.M. supra,* 6 Cal.5th at p. 535, italics added.) "[A]lthough it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant. '[A] conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation], but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Ibid.*) Nevertheless, "an aggressor should not receive the benefit of a potential victim fortuitously taking a

13

defensive measure or being removed from harm's way once an assault is already underway." (*Id.* at p. 537.)

   4. *Analysis*

   Initially, we note Mitchell does not contend the bicycle chain was *incapable* of producing great bodily injury. Instead, his claim is limited to a contention the evidence failed to support the jury's conclusion that the manner in which he used it was *likely* to produce great bodily injury. His somewhat circular argument for why it was unlikely to do so is because it did not do so. We are not persuaded.

   Mitchell relies on *In re B.M., supra,* 6 Cal.5th 528 to support his sufficiency claim. We find it factually distinguishable.

   "In *In re B.M.* [citation], the California Supreme Court clarified what it means for an object to be ""used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.""" (*In re Raymundo M., supra*, 52 Cal.App.5th at p. 86.) The court found insufficient evidence to show the minor's use of a butter knife in that case was likely to cause death or great bodily injury: "[T]he butter knife was not sharp; the minor thrusted it only at her sister's blanket-covered legs and not more vulnerable body parts; the minor used such 'moderate pressure' that the knife neither 'pierce[d] the blanket' nor 'cause[d] serious bodily injury' to the sister; and the record did not support that the sister used the blanket defensively (rather, she had already covered her legs with it because she had just gotten out of the shower and was trying to cover herself)." (*Id.* at pp. 86-87.) "On these facts, the Supreme Court found it 'questionable' whether the knife was '*capable* of causing great bodily injury' [citation], and that there was insufficient evidence to support that the minor's use of the knife was '*likely* to do so.'" (*Id.* at p. 86, citing *In re B.M., supra,* 6 Cal.5th at pp. 536-537; see also *In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1497-1498 [butter knife was not "capable" even when used with sufficient force to break the knife yet did not penetrate the victim's skin].)

14

Here, the metal bicycle chain with an attached metal carabiner is qualitatively different from the butter knife used in *In re B.M.* — both in terms of the way it was used and its resulting effects. Mitchell used the chain to injure Brian B. by striking him in the head, neck, and back, leaving distinctive marks and some bleeding despite Brian B.'s attempts to shield himself. Furthermore, Mitchell swung the chain six to ten times, and inflicted multiple blows. *In re B.M.* does not alter our conclusion substantial evidence supports the jury's verdict.

Mitchell also relies on *People v. Beasley* (2003) 105 Cal.App.4th 1078 (*Beasley*), but it too is factually distinguishable, and for the same reasons.

In *Beasley, supra,* 105 Cal.Ap.4th 1078, the court reversed two aggravated assault convictions: one in which the defendant used a broomstick to strike the victim, and one in which the defendant used a vacuum cleaner attachment to strike the victim. The reversals were based on the prosecution's failure to present evidence concerning the nature of the broomstick and vacuum cleaner attachment. The prosecution had not introduced the actual weapons into evidence, or photographs of them. (*Id.*, at pp. 1087-1088.) Moreover, the victim's testimony regarding those weapons and the force used was "cursory," establishing only that she suffered pain and bruising on her arms and shoulders. (*Id.* at p. 1087.) The record failed to disclose whether the broomstick was made of wood or plastic, whether it was hollow, or anything else regarding its "composition, weight, and rigidity." (*Id.* at pp. 1087-1088.) The court concluded, "The jury therefore had before it no facts from which it could assess the severity of the impact between the [broom]stick and [the victim's] body." (*Id.* at p. 1088.) As for the vacuum cleaner attachment, the victim's testimony only established that it was made of plastic and hollow, but was otherwise "vague" on its size and shape. (*Ibid*.) The *Beasley* court found the evidence of bruising "insufficient to show that [defendant] used the attachment as a deadly weapon" and further held that "[s]triking an adult's shoulder and back with a

15

hollow plastic instrument is not likely to produce significant or substantial injury." (*Ibid.*)

In contrast, here there was more than "cursory" evidence regarding the chain and the severity of the blows with which Mitchell struck Brian B. The chain itself was introduced into evidence, and eyewitness testimony from Ortiz and Chavez described how Mitchell used the chain to repeatedly strike Brian B. multiple times, how Mitchell held the chain, and how he swung it. Although Brian B. was able to block some of the blows with his hands, and used a bicycle as a shield, Mitchell still managed to hit him and cause injury. Brian B. was not just superficially bruised. Indeed, his back showed the distinct pattern of the chain itself, and there was evidence of bleeding.

Moreover, Mitchell's conduct cannot be minimized merely because Brian B. took evasive action and shielded himself with the bicycle, thereby partially thwarting the assault and avoiding more serious injuries. (See *People v. Chance* (2008) 44 Cal.4th 1164, 1173 ["an assault may occur even when the infliction of injury is prevented by environmental conditions or by steps taken by victims to protect themselves"]; cf. *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1168 ["a jury could reasonably conclude that the [victim] would likely have been touched with the knife had he not moved out of the way"]; *In re B.M., supra*, 6 Cal.5th at p. 537 ["an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway"].)

In *People v. Montes* (1999) 74 Cal.App.4th 1050, a different panel of this court upheld a jury's guilty verdict on an assault with a deadly weapon charge where the weapon employed was a doubled-over three-foot-long chain, "'kind of thick'" and "'bigger than a wallet chain,'" swung at a rival gang member, striking him once on the shoulder. (*Id.* at p. 1053.) We concluded that, even though a chain is not an inherently deadly weapon, when "[u]sed in this manner, the chain was capable of producing and

16

likely to produce great bodily injury. The jury was therefore entitled to find it constituted a deadly weapon." (*Id.* at p. 1054.) So too here.

Mitchell reiterates the relatively minimal nature of Brian B.'s injuries, pointing out he declined to go to the hospital and did not need extensive medical assistance at the scene. Although the nature of the injury may be relevant in some situations, the statute focuses on the *use* of the deadly weapon, not the harm suffered by the victim. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) Furthermore, the jury reasonably could infer Brian B.'s lack of serious injuries was attributable to his defensive actions than to whether or not the chain was likely to cause greater injury but for those protective maneuvers.

In the end, we are not free to reform a jury's verdict simply because the facts could support another conclusion. (*People v. Jackson* (2016) 1 Cal.5th 269, 345.) "Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.)

Here the trial court correctly instructed the jury, and Mitchell does not take issue with those instructions. Rather, he argues the jury simply got it wrong based on the facts. This misconstrues the standard of review and, in essence, asks us to reweigh the evidence. Substantial evidence supports the jury's finding the bike chain was a weapon used in a manner capable of and likely to produce great bodily injury.

C. *Prosecutorial Misconduct*

Mitchell next alleges several instances of prosecutorial misconduct during the prosecutor's closing arguments. We address them individually below, and conclude there was no prejudicial misconduct.

1. *Legal Background*

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the

17

complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970 (*Frye*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."'" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) "'"A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 943 (*Hoyt*).)

"It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) "'"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.'"'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820 (*Hill*).)

2. *Allegations of Misconduct*

a. *Burden-Shifting and Evidence Outside the Record*

Mitchell first argues the prosecutor engaged in burden-shifting when she told jurors the defense had "equal subpoena power" under the law. Further, he argues the prosecutor's comments regarding "subpoena power," were an improper reference to matters outside the record because they suggested the defense could have presented exonerating evidence but did not, or there was no exonerating evidence because it had not been presented.

"Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.'" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.)

Although Mitchell "singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) Taken in context, here the prosecutor's comments about "equal subpoena power" were in direct response to defense counsel's earlier argument: "[Defense counsel]: This case is only half a story. The D.A. failed to call logical witnesses. Obviously, you would want to hear from [Brian B.], and even [another homeless man in the group] . . . . So [the prosecutor] might say that I have the subpoena power to call witnesses, but that's not my burden. I don't have to put anything on."

In rebuttal, the prosecutor did indeed tell the jury about what she called a "[f]ailure to call logical witnesses." However, she prefaced it by saying, "Defense has no burden of proof. As I said in voir dire, I love my burden. The burden is on me to prove this case beyond a reasonable doubt."

19

Notably, after the defense objected to the prosecutor's "subpoena power" remark, the trial court admonished the jury, telling them: "[The prosecutor] has already told you she's not arguing that the defense has any burden of proof at all, and that's the law. The defense does not have any burden of proof. [¶] As I've said before, this is counsel's argument. You can consider it, accept it, or reject it." When the prosecutor tried to return to her "subpoena power" argument, and defense counsel objected again, the court told the prosecutor to "move on," and reiterated that the defense had no burden of proof. We perceive no error and if there were any, the court's admonishments cured it.

Mitchell also complains about the prosecutor's reference to her discovery obligations that required her to give the defense "all the evidence I have, not just all the evidence I use, . . . evidence that helps me convict and evidence that could help exonerate, all of that I have I have to turn over. I have to give it to the defense." He argues this improperly referred to matters outside the record and "improperly suggested there was evidence the defense could have presented but did not, and also implied the defense had no exculpatory evidence." The trial court rejected defense counsel's argument that the prosecutor's remark about exonerating evidence implied the existence of that evidence, stating "I don't think it implies anything like that." We concur. In essence, the prosecutor's remarks merely pointed out that a failure to call logical witnesses can run both ways.

The prosecutor's remarks were a further explication of her arguments to rebut the defense suggestion the prosecution failed to call all the possible witnesses in the case. Her point was simply that the defense also could have called those witnesses because both sides have the same access to the same information. While she technically referred to "facts" outside the record, these "facts" were not evidence, nor did she suggest otherwise. It is not reasonably probable the jury was influenced or misled by these relatively harmless remarks, made within the context of the prosecutor's permissible

20

rebuttal regarding the defense's ability to call the same witnesses it faulted the prosecution for not calling.

Moreover, from the outset, the prosecutor repeatedly "reiterated that the prosecution had the burden of proof by sufficient evidence to establish defendant's guilt, and that defendant had no duty or burden to produce any evidence. [Citation.] A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The prosecutor's comments about "subpoena power" fairly suggested that if there was more to the story, as defense counsel told the jury, the defense could have told it. There was no impropriety in doing so. The jury was not likely to misconstrue the prosecutor's rebuttal comments about Mitchell's ability and failure to call witnesses. (*Cole, supra,* 33 Cal.4th at pp. 1202-1203.)

b. *Vouching*

"As a general matter, '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' [Citation.] . . . Similarly, it is misconduct '"to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." [Citation.] The vice of such remarks is that they "may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.""" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329-1330.) In the context of closing argument, ""[s]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [her] comments cannot be characterized as improper vouching." [Citation.]'" (*Id.* at p. 1330.)

21

In response to defense counsel's closing arguments pointing out inconsistencies within and between Ortiz's and Sanchez's testimony, the prosecutor discussed how two witnesses may perceive events differently, and mere inconsistencies need not lead the jury to reject a witness's testimony (see CALCRIM No. 226). The prosecutor suggested that when two people see the same thing, they will describe it differently. She said, "[m]inor inconsistencies when it comes to civilian witnesses, that's the hallmark of civilian witness credibility." Defense counsel objected, stating the prosecutor was vouching for Ortiz and Sanchez. The trial court overruled the objection, stating "This is just argument."

This was not improper vouching or referring to evidence not before the jury. The prosecutor "nowhere suggested that [she formed her] opinion based on ""'evidence available to the government, but not before the jury.'"" [Citation.] Nor did [she] imply the jury should adopt the prosecution's view because of its ""'prestige, reputation, or depth of experience.'""" (*People v. Krebs* (2019) 8 Cal.5th 265, 344 (*Krebs*).)

Similarly, she did not suggest she had other evidence, not given to the jury to support Ortiz's and Sanchez's credibility (compare *People v. Turner* (2004) 34 Cal.4th 406, 433 [prosecutor improperly vouched for the credibility of expert witnesses by referring to the prosecutor's personal knowledge and prior use of them]), or that she personally believed the witnesses independent of the evidence.

Mitchell cites *People v. Rodriguez* (2018) 26 Cal.App.5th 890, review granted November 18, 2018, S251706, in support, but it is not on-point. In *Rodriguez,* an inmate assaulted two correctional officers in the hallway of a prison facility. (*Id.* at pp. 895-897.) The prosecutor improperly vouched for the credibility of his prison guard witnesses, arguing that "the likelihood of being fired or prosecuted . . . would deter the officers from lying," when there was no evidence presented at trial of any such "likelihood." (*Id.* at p. 903.)

22

Here, the prosecutor's comments simply pointed out the jury need not determine the credibility of witnesses solely by whether they completely agreed on how they perceived events.  Moreover, civilians, as opposed to trained police officers, are not professional witnesses, and it is "common knowledge" or "common experience," that two lay persons will often see or recollect events differently.  (*Hill, supra,* 17 Cal.4th at pp. 819-820, internal quotation marks omitted.)  Indeed, the jury was instructed on just this fact with CALCRIM No. 226.[6]

The prosecutor's remarks about civilian witnesses "would not be understood to refer to facts available solely to the government or to the prosecutor's personal knowledge or beliefs or the prestige of her office." (*People v. Mendoza* (2016) 62 Cal.4th 856, 907 (*Mendoza*).)  "Accordingly, there was neither impermissible vouching nor reliance on evidence outside the record." (*Krebs, supra,* 8 Cal.5th at p. 344.)

c. *Misstating the Evidence*

"It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence." (*Mendoza, supra,* 62 Cal.4th at p. 906.)

Mitchell argues, "The prosecutor misstated the evidence by stating Ortiz said she's never called the cops, but she did in this case because it was so bad.  The record reveals Ortiz never reported a crime, however it was Sanchez who called 911." The Attorney General agrees, but argues it was a "mistaken reference to the wrong witness."

Mitchell insists "it was still a misstatement of the evidence, and constituted prosecutorial error," and even though he "does not suggest this was anything other than

---

[6]     "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember.  Also, two people may witness the same event yet see or hear it differently."  (CALCRIM No. 226.)

23

an honest mistake, [Mitchell] was prejudiced by it nonetheless." He offers no authority or argument for *how* he was prejudiced by this misstatement in closing argument, which had nothing to do with the evidence or with the witnesses' actual testimony.[7] As noted, "[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must *show* a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*Frye, supra,* 18 Cal.4th at p. 970, italics added.) Here, Mitchell merely has pointed out a harmless misstatement, but he has not *shown* how it prejudiced him or how it likely led the jury to consider the remark in an improper or erroneous manner.

This "honest mistake" in closing argument, regarding which of two witnesses called 911, "did not *substantially* misstate the facts or go beyond the record." (*People v. Dennis* (1998) 17 Cal.4th 468, 522, italics added.) "Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury." (*Ibid.*) The prosecutor's comment does not constitute misconduct.

d. *Speculation*

A prosecutor may not ask the jury to speculate about evidence not presented at trial. (*Yeoman*, *supra*, 31 Cal.4th at p. 149.)

In her opening remarks, the prosecutor displayed the bicycle chain to the jurors and asked them to consider what would happen if the "victim got beat" with it "in a different manner," explaining "that's why this is a deadly weapon." Defense counsel objected because it "calls for speculation." The trial court sustained the objection, and admonished the jury, "[T]his is just counsel's argument. As I told you before, what

---

[7]     Sanchez testified she called 911 that day, and a recording of her 911 call was played in court; Sanchez identified her voice on the 911 call. The recording of Sanchez's 911 call, and a transcript, were entered into evidence as exhibits 4 and 4A. The jury was not likely to have misconstrued who made the 911 call.

comes out of counsel's mouth is not evidence. It's her take on the facts and how they apply to the law. What really counts in the end is your take on the facts and the law."

Mitchell renews the argument here, but again provides no argument or authority for how he was prejudiced by the remark or how it improperly influenced the jury.

Moreover, immediately after this admonishment, the prosecutor "prudently amended [her] remarks" (*Yeoman, supra,* 31 Cal.4th at p. 149), and clarified that, "[W]hen I say that if used in a more aggressive manner, what I'm saying is that great bodily injury does not have to occur. For a weapon to be a deadly weapon . . . [i]t just has to be capable of causing G.B.I. Capable. When you beat someone with a chain like that . . . it is capable of causing G.B.I." In context, the prosecutor's comments suggested to the jury that they examine the chain and determine whether it was capable of producing great bodily injury even though it did not do so in this case. Moreover, the trial court immediately admonished the jury that argument is not evidence. Thus, even if the prosecutor's original remark was improper, we find no "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

### 3. *Conclusion*

"Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) "Under state law, a prosecutor's action that does not cause fundamental unfairness is prosecutorial misconduct only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""'" [Citation.]" (*People v. Duong* (2020) 10 Cal.5th 36, 69.)

Mitchell does not claim the prosecutor used """"deceptive or reprehensible methods""'" in an attempt to persuade the jury, or that her statements "'so infected the

25

trial with unfairness as to make the resulting conviction a denial of due process.'" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) In addition, Mitchell makes no allegation the trial court misinstructed the jury and points to nothing concrete in the record indicating the jury understood or applied the prosecutor's closing arguments in any improper or erroneous manner.

In reviewing "the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184-185.) "[W]e presume that the jury relied on the instructions, not the arguments, in convicting defendant. '[I]t should be noted that the jury, of course, could totally disregard *all* the arguments of counsel.' [Citation.] Though we have focused on the prosecutor's closing arguments, we do not do so at the expense of our presumption that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] The trial court emphasized this rule when . . . it instructed the jury to follow its instructions and to exalt them over the parties' arguments and statements." (*Morales, supra,* 25 Cal.4th at p. 47.)

That is what happened here. Before closing arguments began, the trial court pre-instructed the jury. The instructions included CALCRIM Nos. 200 and 222, which told the jury it was to base its decision only on the evidence presented, that the attorneys' arguments were not evidence, and that the jury must follow the law as stated by the court, even if the attorneys' comments conflicted with the court's instructions.

In the context of the prosecutor's entire closing arguments, the court's admonishments, and the instructions the court gave to the jury, Mitchell has failed to "show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*Frye, supra,* 18 Cal.4th at p. 970.) Therefore, either individually or collectively, "we conclude none infected the trial with

unfairness or deceived the court or jury." (*Hoyt, supra,* 8 Cal.5th at p. 943.) There was no prejudicial prosecutorial error.[8]

4. *Fines, Fees, and Court Assessments*

Lastly, Mitchell contends "[t]he $40 court operations assessment (§ 1465.8) and $30 conviction assessment (Gov. Code, § 70737) noted on the abstract [of judgment] must be stricken because they were not orally pronounced by the trial court." We disagree.

After imposing Mitchell's prison term, the court levied $320 restitution and parole revocation fines, suspending the latter upon successful completion of parole. The court then stated, "All mandatory criminal and court cost[s] and fees are hereby imposed." The court specifically inquired of defense counsel, "Does the defense counsel *waive recitation of those fines and fees*?" (Italics added.) She replied, "Yes, your honor." Moving on, the court declined to assess Mitchell with the costs of preparing the probation and sentencing report, finding he had no ability to pay for it. No other fines, fees or assessments were mentioned by either counsel or by the court.

The court's minutes and the abstract of judgment show a restitution fine of $300 (§ 1202.4), a parole revocation fine of $300 (§ 1202.45), a court operations fee of $40 (§ 1465.8), and a criminal conviction assessment of $30 (Gov. Code, § 70373, subd. (a)(1) . The minutes also show a booking fee assessed in the amount of $249.27.

Generally, the failure to object to the imposition of court fees forfeits a subsequent claim on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864

---

[8]  For the first time on appeal, defendant argues the prosecutor's closing arguments also denied him his federal constitutional rights to due process and confrontation. However, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — *and on the same ground* — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841, italics added.) Here, defendant "made no objections expressly or even impliedly referring to the federal Constitution and thus forfeited the issue." (*Seumanu, supra,* 61 Cal.4th at p. 1332.)

27

[probation-related costs and cost of appointed counsel]; *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854 [booking fee]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [restitution fine]; cf. *People v. Avila* (2009) 46 Cal.4th 680, 729 [inability to pay more than the statutory minimum restitution fine].)  However, here there is a more fundamental concern.

We are not confronted in this case with a question of *forfeiture* because Mitchell expressly waived any right he had to a verbal accounting of his fines and fees. As the United States Supreme Court has explained:  "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'  [Citations.]"  (*United States v. Olano* (1993) 507 U.S. 725, 733.)

Mitchell contends the trial court erred by not orally imposing all the fines and fees and, consequently, they must be stricken.  However, "[d]eviation from a legal rule is 'error' *unless* the rule has been waived."  (*United States v. Olano, supra,* 507 U.S. at pp. 732-733, italics added.)  Phrased differently, if a legal rule has been waived, deviation from that rule is not error.

Mitchell argues he "*assumed* the fees and fines imposed would be legal, would be calculated correctly, and would take into account his ability to pay, but they did not."  (Italics added.)  There is nothing in the record to support this purported "assumption."  More importantly, such an "assumption" is predicated upon a premise there were sentencing *errors* in this regard, but there was no error precisely because Mitchell waived the purported error at his sentencing hearing.[9]

---

[9]  Mitchell inaptly analogizes to *People v. Penoli* (1996) 46 Cal.App.4th 298, where the court held a defendant cannot prospectively waive *future* conduct credits for the time she would later be serving in a residential drug program as a condition of probation. There, in that case, the defendant objected to that term of probation when it was imposed, i.e. the defendant did not *waive* her right to challenge the probation term at the time of sentencing.  (*Id.* at pp. 301-302.)  Mitchell's citation to *Hicks v. Oklahoma* (1980) 447 U.S. 343 is also misplaced because it has nothing to do with waivers.

28

For the first time in his reply brief, Mitchell argues his fines and fees also must be stricken because he was unable to pay them due to his indigency, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Not only did Mitchell fail to raise this issue in the trial court,[10] he also failed to raise it in his opening brief. "[P]oints raised for the first time in a reply brief on appeal will not be considered, absent good cause for failure to present them earlier." (*Nordstrom Commission Cases* (2010) 186 Cal.App.4th 576, 583.) Here, "no reason whatever is given for this departure from the ordinary method of presenting a case in this court." (*Kahn v. Wilson* (1898) 120 Cal. 643, 644.) We therefore find the *People v. Dueñas* claim forfeited, and do not consider it here.

The Attorney General argues the abstract of judgment must be amended to include the booking fee. Mitchell responds the court erred in imposing a booking fee without a factual determination of his ability to pay it and proof that the amount requested did not exceed the actual cost of booking. He is correct.

A booking fee is not mandatory, and instead is contingent on a defendant's ability to pay and the "actual administrative costs" incurred. (Govt. Code, § 29550.2, subd. (a).) Neither of those determinations were made here. Moreover, Mitchell's waiver of a verbal "recitation" of the *mandatory* costs and fees did not encompass the nonmandatory booking fee.

Normally, a failure to object to the imposition of booking costs in the trial court forfeits the claim on appeal. (*People v. McCullough* (2013) 56 Cal.4th 589, 591.) Here, the court did not orally impose any booking costs at the time judgment was entered, and therefore Mitchell had no opportunity to object. The booking costs order must be stricken. (Cf. *People v. Rodriguez* (2019) 34 Cal.App.5th 641, 648 [same for attorney's fees].)

---

[10]    Mitchell cannot claim he was unable to raise the claim in the trial court. *People v. Dueñas* was decided on January 8, 2019, and Mitchell was sentenced on February 7, 2020. (*Duenas, supra*, 30 Cal.App.5th at p. 1157.)

Finally, as noted *ante*, the court verbally imposed $320 restitution and parole revocation fines, but the court minutes and abstract of judgment instead reflect $300 fines.  "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  Moreover, "an abstract of judgment must reflect a restitution fine a sentencing court has orally imposed. . . ." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.)  We may "correct[] clerical errors in the abstract of judgment without a request from either party."  (*Id.* at p. 187.)  We do so here. (See § 1260.)

### III

### DISPOSITION

The judgment is affirmed as modified.  Upon issuance of the remittitur, the superior court is directed to strike the booking costs order, to prepare an amended abstract of judgment that reflects the trial court's oral imposition of $320 restitution and parole revocation fines, and to forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

30